UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
RAMMERS AND PAVERS UNION, LOCAL 1010
OF THE LABORERS INTERNATIONAL UNION
OF NORTH AMERICA, ASHPHALT WOKERS
UNION LOCAL 1010 OF THE LABORERS
INTERNATIONAL UNION OF NORTH AMERICA,
PAVERS AND ROAD BUILDERS DISTRICT
COUNCIL, and VINCENT MASINO, as Trustee,

                              Plaintiffs,                    **MEMORANDUM & ORDER**

                  - against -                                No. 05-cv-2336 (ERK) (RML)

LUCIANO FALZONE, ROBERT MARESCO, JOHN
MORELLO, ALFONSO LETO, CALOGERO
FALZONE, ROLAND BEDWELL, CONSTANTINO
SEMINATORE, DAVID MONTELLE, ROCCO
CIANCIO, JOSEPH J. MONTELLE, ANIBAL V.
RIBEIRO, ALFONSO COLON, J. FERRO,
UNITED PLANT AND PRODUCTION WORKERS,
LOCAL 175, and AMALGAMATED LOCAL UNION
450A,

                              Defendants.
-----------------------------------------------------------------X

KORMAN, J:

        This action is one of a number of separate pending actions which arise from the alleged

misconduct of former leaders of local road builders unions of the Laborer's International Union

of North America ("LIUNA").  Plaintiffs here are the Rammers and Pavers Union, Local 1010 of

LIUNA ("Local 1010"), the Asphalt Workers Union Local 1018 of LIUNA ("Local 1018"), the

Pavers and Road Builders District Council ("District Council"), and Vincent R. Masino, Trustee

of Locals 1010 and 1018 and the District Council ("Masino").

        In their First Amended Complaint, plaintiffs allege twenty-three causes of action – both

federal and state – against their former union leaders and two local unions not affiliated with

LIUNA.  Defendants, who are described below, have moved for summary judgment on all

twenty-three causes of action. Plaintiffs have conceded that all but their first eleven claims

(counts 1 through 11) are either moot (counts 12 through 17 and count 23), preempted by the

National Labor Relations Act ("NLRB") (counts 18 through 21), or otherwise withdrawn (count

22). Pls.' Opp'n Mem. at 1 n.1.

Defendants argue that counts 9 through 11 are also moot. In those counts plaintiffs seek

injunctive relief, or, in the alternative, declaratory relief directing defendants to recognize the

validity of the trusteeships imposed by LIUNA over, respectively, Locals 1018 and 1010 and the

District Council and to cooperate with the Trustee. Count 10 is moot because the trusteeship of

Local 1010 ended in December 2008. *See Santo v. LIUNA, Local 1018*, No. 07-cv-4735, Rep. &

Rec., at 6 (E.D.N.Y. March 27, 2009), *adopted* April 28, 2009. As to Counts 9 and 11,

defendants concede the validity of the Local 1018 and District Council trusteeships for purposes

of this motion, Def.'s Reply Mem. at 14 n.30, and the continued validity of those trusteeships is

the subject of another matter pending in this District. *See Santo v. LIUNA, Local 1018*, *supra*

(suit by individual members of Locals 1010 and 1018 against plaintiffs here, seeking to terminate

those trusteeships).

In the remaining counts – counts 1 through 8 – plaintiffs allege that defendants breached

their obligations under the LIUNA Constitutions in violation of section 301 of the Labor

Management and Relations Act, 29 U.S.C. § 185 (counts 1 and 2), breached their fiduciary duties

in violation of N.Y. Labor Law § 722 (counts 3 through 6), and breached their common law duty

of loyalty (counts 7 and 8). Plaintiffs argue that these various breaches resulted from defendants'

efforts to preserve their union leadership positions and their control over the union entities' funds

by thwarting LIUNA's efforts to rid itself of the corrupting influence of organized crime.

Briefly, when it became clear that LIUNA would place Locals 1010 and 1018 and the District

Council under trusteeship, plaintiffs argue that defendants encouraged and made no effort to prevent their members from resigning from Locals 1010 and 1018 and joining unions not affiliated with LIUNA: defendants United Plant and Production Workers Local 175 ("Local 175") and Amalgamated Local Union 450A ("Local 450A").  Plaintiffs allege these breaches against two groups of defendants.

The first group of defendants held leadership positions within Local 1018.  They include Luciano Falzone ("Falzone') , former Business Manager and Executive Board member of Local 1018, and President of the District Council; and other former members of the Executive Board of Local 1018 ("Local 1018 defendants").  The other group of defendants were leaders of Local 1010 and officers and Executive Board members of the District Council.  They include David Montelle ("Montelle"), former Business Manager and Executive Board member of both Local 1010 and the District Council; and other former members of the Executive Boards of Local 1010 and the District Council ("Local 1010 defendants").

## Factual Backgound

Beginning in the mid-1990s, the Department of Justice began investigating the corrupting influence organized crime had over LIUNA and its affiliates.  Locals 1010 and 1018 are subordinate locals of LIUNA and represent workers who maintain the streets and highways of New York City.  Pls.' R. 56.1 Counter Stmt. ¶¶ 1, 4.  The Locals are constituent entities of the District Council, which is also a subordinate entity of LIUNA.  *Id*. ¶ 2.   In 1995, LIUNA and the United States entered an agreement under which the United States agreed to forbear filing any civil complaint while LIUNA implemented an internal reform program.  It is not necessary to lay out in detail this reform program or the nature of the corrupt influences exerted by organized crime on LIUNA and its affiliate here. Nevertheless, LIUNA's ongoing efforts to investigate and

rid itself of organize crime form the backdrop of this action, as well as a number of related actions.

In 2002, LIUNA determined that Anthony Franco, who then served as the President of the District Council, Secretary-Treasurer of Local 1018, and the Administrator of the District Council Benefit Fund, was a Gambino crime family associate and had, among other things, extorted $25,000 from a contractor. LIUNA ordered Franco expelled from all positions and membership in LIUNA or any affiliated entity and fund. *See id*. ¶¶ 47-50. Franco resigned his union positions but refused to resign as Administrator of the Benefit Fund. *Id*. ¶ 51. LIUNA sought the cooperation of Falzone, Montelle, and Rocco Ciancio, one of the Local 1010 defendants, to affect Franco's expulsion. *See id*. ¶ 53. Subsequently, in 2003, LIUNA informed Falzone and Montelle, who were trustees of the Benefit Fund administered by Franco, that if they did not cooperate to seek Franco's removal they were at risk of being relieved of their leadership positions at Locals 1018 and 1010 by trusteeship. *Id*. ¶ 57. "When . . . action is necessary for the purpose of correcting corruption," LIUNA may appoint a temporary trustee "to take charge and control of the affairs of . . . subordinate bod[ies]. . . . During the period of trusteeship all the officers and delegates of the subordinate body are relieved of their particular trust." International Union Constitution, Art. IX § 7 (attached as Ex. 16A to Dec. of Barbara S. Mehlsack ("Mehlsack Dec.")).

Rather than aid in removing Franco from his post as fund administrator, however, Falzone and Montelle, along with other Fund trustees, amended the agreements governing the Benefit Fund to prevent the LIUNA Trustee, Vincent Masino, from removing Franco and the Fund trustees. Pls.' R. 56.1 Counter Stmt. ¶ 60. In May 2004, Falzone, Montelle and the entire Executive Boards of Locals 1018 and 1010 were summoned by LIUNA officials to Washington,

D.C., where it was made clear that the trustees had an obligation under the LIUNA Constitutions to seek Franco's removal and that their failure to do so would result in the imposition of a trusteeship. *Id.* ¶ 68. Instead of seeking Franco's removal, however, Falzone sought and obtained authorization from Local 1018's membership to spend $100,000 to defeat a possible trusteeship. *Id.* ¶ 69. When it became clear that he could not defeat a trusteeship, Falzone, along with others, established the Death Benefit Trust Fund, the purpose of which was "'to prevent the trustee from having access to the funds of the Local Union . . . ' in the event of a trusteeship." *Id.* ¶ 71.[1]

In April 2005, in anticipation of the trusteeship, Falzone recommended to the Local 1018 Executive Board that Local 1018 secede from LIUNA and join with another union unaffiliated with LIUNA to avoid a trusteeship. *Id.* ¶ 74. In late April or early May 2005, Masino asked Falzone about rumours he had heard that Local 175, which was not affiliated with LIUNA, was attempting to raid Local 1018 membership. *Id.* ¶ 92. Masino asked Falzone to protect Local 1018's jurisdiction by soliciting Local 1018 members to sign cards authorizing Local 1018 to represent its members as a collective bargaining unit. *Id.* ¶ 92. Falzone refused because he was told that Local 1018 would be put under trusteeship, which would result in his being relieved from his position as Business Manager. *Id.* ¶ 96. Instead, on May 2, 2005, he wrote to the National Labor Relations Board ("NLRB") Regional Director, that, in light of "the fact that Local 175 has obtained representation authorization from a substantial majority of the persons our Local has represented in that unit," "Local 1018 hereby withdraws, and rescinds, its interest

---

[1] The validity of the Death Benefit Trust Fund is the subject of *Masino v. Falzone,* No. 05-cv-2668 (E.D.N.Y. filed June 2, 2005). On April 28, 2009, I adopted the recommendation of United States Magistrate Judge Levy, which declared the Death Benefit Trust Fund void and ordering Falzone to surrender the assets in the fund account to Local 1018.

in representing the bargaining unit in question." Dec. of Eric B. Chaikin ("Chaikin Dec."), Ex. F.

On May 4, 2005, the New York Independent Contractors Alliance, Inc. ("NYICA"), an association of independent contractors specializing in, among other things, paving and road building work, which is the collective bargaining agent for it members, sent a letter to Local 175 (copying Falzone) formally recognizing "Local Union 175 as the exclusive bargaining representative of those unit members formally represented by Local Union 1018." Chaikin Dec., Ex. H. NYICA recognized Local 175 only after it had reviewed the authorization cards Falzone had brought it, which showed that a majority of Local 1018 members had authorized Local 175 to be their representative. *Id*.; Pls.' R. 56.1 Counter Stmt. ¶ 102. Local 1018 and the District Council sought to invalidate Local 175's status as the exclusive bargaining agent by filing unfair labor practice charges against Local 175. Mehlsack Dec., Exs. 29A, 29B; Chaikin Dec., Exs. L, M.

With the membership transferred from Local 1018 to Local 175 and the impending trusteeship, on May 6, 2005, Falzone and the entire Executive Board of Local 1018, including all of the Local 1018 defendants, resigned their respective positions within Local 1018 and the District Council. Dec. of Benjamin A. Karfunkel ("Karfunkel Dec."), Ex. B. Within three days of resigning from Local 1018, Falzone became Business Manager of Local 175. Pls.' R. 56.1 Counter Stmt. ¶ 107. Once he became Local 175's Business Manager, Falzone, using membership lists he had obtained while Business Manager of Local 1018, sent letters to former Local 1018 members advising them that Local 1018 had merged with Local 175. *Id*. ¶¶ 108-10; Karfunkel Dec., Exs. M & N.

On May 9, 2005, LIUNA appointed Masino Trustee of Local 1018. *Id.* ¶ 104. Around that time, Masino spoke with Montelle, and Montelle's son, Local 1010 defendant Joseph Montelle, about Falzone's involvement in the raiding of Local 1018. Deposition of Vincent R. Masino ("Masino Dep.") 115 (attached as Ex. 5 to Mehlsack Dec.) Montelle, as Business Manager of the District Council, was responsible for knowing what was happening with his affiliates, including Local 1018. *Id.* at 117; Mehlsack Dec., Ex. 16B, Art. VII § 4(b)(3). Masino also asked Montelle to obtain authorization cards from Local 1010 membership to protect the local from being raided. Masino Dep. 116. Montelle, however, "refused. He said . . . it would be an indication of weakness, or his membership would have a lack of confidence" because "lots of his members were Portuguese-speaking immigrants and they wouldn't understand why they were being asked to sign a card." *Id.*; Pls.' R. 56.1 Counter Stmt. ¶ 114.

Shortly thereafter, on May 11, 2005, Montelle surrendered the lease for Local 1010's headquarters, Pls.' R. 56.1 Stmt. ¶ 117, and, on that same day, Montelle, along with the entire Executive Board of Local 1010, resigned from their positions with Local 1010 and the District Council. Karfunkel Dec., Exs. D, E. Almost immediately upon resigning from Local 1010, Montelle started a new union unaffiliated with LIUNA, the construction Local 450A, and appointed himself Business Manager. *See* Deposition of David Montelle ("Montelle Dep.") 60-61 (attached as Ex. 10 to Mehlsack Dec.). He created the construction local within Local 450A because he wanted to ensure that his members' (former Local 1010 members) benefits would be protected and under the control of the District Council Benefit Fund, which was administered by Franco and of which Montelle was a trustee. *Id.* at 12. The Benefit Fund and Local 450A, which already represented the office staff of the Fund, had negotiated a participation agreement

sometime in 2004. Montelle believed that because of the participant agreement, "[former Local 1010] members would still have their benefits if they went to 450A." *Id.*

On May 12, 2005, LIUNA appointed Masino Trustee of Local 1010 and the District Council, citing Montelle's failure to "take necessary and lawful steps to protect the Local Union's collective bargaining and representation rights" despite "repeated requests from representatives of [LIUNA] to do so." Karfunkel Dec., Ex. F; *see also id.* at Ex. G. When Masino, now Trustee of Locals 1018 and 1010 and the District Council, sought to gain access to the offices of those entities to take possession of their books and records, Franco, who administered the holding company that owned the building, barred Masino's entry and threatened to call the police. Pls.' R. 56.1 Counter Stmt. ¶¶ 117-18, 124. Franco told Masino that the offices had been rented to Locals 175 and 450A. Masino Dep. 64; *see also* Deposition of John Peters ("Peters Dep.") 116 (attached as Ex. 6 to Mehlsack Dec.).

Without access to the offices, records, or computers of Locals 1010 and 1018 and the District Council, those entities, now under Masino's control, incurred costs paying for temporary office space, purchasing a new computer system, and ultimately, finding and fixing up a new office space. Peters Dep. 115-117. While Locals 1010 and 1018 and the District Council were struggling to recreate their infrastructure, it appears that Falzone and Montelle were actively soliciting members of Locals 1010 and 1018 to transfer their representation rights to Locals 450A and 175 respectively. Peters Dep. 117-18. To prevent Local 450A from obtaining representation rights within its jurisdiction, Local 1010 incurred costs organizing its members and petitioning for elections to retain its right to represent Local 1010 members in collective bargaining negotiations. Peters Dep. 118-19; Masino Dep. 66.

Plaintiffs filed their complaint on May 13, 2005 and amended it on June 12, 2006. Defendants now move for summary judgment.

**Discussion**

As discussed above, plaintiffs' complaint alleges twenty-three causes of action against the various defendants. Of those twenty three, however, only the first eight counts remain in dispute. Counts 1 and 2 allege violations of federal law, while counts 3 through 8 are based on New York law. I address the federal claims first.

**I. Federal Claims**

In counts 1 and 2, plaintiffs allege that defendants breached their obligations under various LIUNA Constitutions in violation of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Defendants press two arguments in support of their motion for summary judgment. First, they argue that plaintiffs' federal claims must be dismissed because they seek monetary relief, which is not available against individual defendants under § 301(b). Second, defendants argue that plaintiffs have not produced sufficient evidence from which a reasonable jury could find that defendants have breached their obligations under the LIUNA Constitutions. Each is addressed in turn.

**A. Section 301(b) Does Not Bar Plaintiffs Claims for Monetary Relief**

Defendants argue that counts 1 and 2, which both allege violations of § 301 and seek relief for plaintiffs' injuries "in an amount yet to be determined," compl. ¶¶ 110, 113, must be dismissed because individual union members or officials are not liable for money damages under § 301(b). Defendants read § 301(b) too broadly. In relevant part, § 301(b) provides: "*Any money judgment against a labor organization* in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be

enforceable against any individual members or his assets." 29 U.S.C. § 185(b) (emphasis added).

In *Atkinson v. Sinclair Refining Co*., 370 U.S. 238 (1962) and *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401 (1981), the Supreme Court examined the scope and purpose of § 301(b). *Atkinson* held that individual union members, who had stopped work at the union's direction, could not be held personally liable for § 301 damages caused by the union's actions, but that the union itself could be liable. *Id*. at 245-7. "[T]he national labor policy [and § 301(b)] require[] and we hold that when a union is liable for damages for violation of the no-strike clause, its officers and members are not liable for these damages." *Id*. at 249. *Complete Auto Transit* held that individual employees cannot be liable for § 301 damages for violating a no-strike provision of a collective bargaining agreement, "whether or not their union participated in or authorized the strike." 451 U.S. at 417. In both cases the Court recognized that in enacting § 301(b) Congress was focused primarily on "liability for damages arising from the[] breach of the no-strike clause of a collective bargaining agreement." *Id*. at 407; *Atkinson*, 370 U.S. at 249. Congress was concerned that without § 301(b)'s protection "the doors of the Federal courts [would be open wide] to damages suits against any person who engaged in a strike or attempted to persuade other employees to engage in a strike." *Complete Auto Transit,* 451 U.S. at 413.

Indeed, § 301(b) "was a deeply felt congressional reaction against the Danbury Hatters case," which resulted in a large money judgment in favor of an employer and against individual union members, officers, and agents who had participated in "a nationwide, union-directed, boycott of [the employer's] hats." *Atkinson*, 370 U.S. at 248. It was Congress' "intention that the union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for *injury inflicted by it*.'" *Id.* at 249 (emphasis added). Just as the corporate veil

protects or shields corporate shareholders from the corporation's liability, § 301(b) shields union members from liability stemming from union actions. "Where the union has inflicted the injury it alone must pay." *Id*. at 249.

Atkinson and *Complete Auto Transit*, however, did not hold that § 301(b) limits union members' personal liability in every action brought under § 301(a). *Contra Bldg. Material Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500, 507-08 (9th Cir. 1989) (relying on *Complete Auto Transit* to hold that § 301(b) immunizes individual union officers from damage suits of any kind). By its terms, § 301(a) creates a federal cause of action for violations of labor contracts, which include union constitutions. *Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93, 100 (1991). Section 301(b)'s limitation on individual liability, on the other hand, is much narrower in scope; it only limits such liability when the union itself has "inflicted the [alleged] injury." *Atkinson*, 370 U.S. at 249. And, as the legislative history reveals, § 301(b) primarily was intended to limit individual liability in damage suits related to worker strikes. *Complete Auto Transit*, 451 U.S. at 407.

Nevertheless, defendants have cited cases which rely on dictum in *Shea v. McCarthy*, 953 F.2d 29 (2d Cir. 1992), for the proposition that § 301(b) bars plaintiffs from recovering damages against individual union members in any action brought under § 301. *See* Defs.' Mem. at 24 (citing *Commer v. McEntee*, No. 00-cv-7913, 2006 U.S. Dist. Lexis 82395 (S.D.N.Y. Nov. 13, 2006)); Defs.' Reply Mem. at 19 (citing *Farrell v. Hellen*, 367 F. Supp. 2d 491 (S.D.N.Y. 2005)). But *Shea* did not cite much less examine the scope of § 301(b). The issue in *Shea* was "whether section 301(a) authorizes [union members to bring] suit against union officials who [violate union constitutions]." 953 F.2d at 31. *Shea* found that it did and permitted plaintiffs' § 301 claim for equitable relief against union officials to go forward. *Id*. *Shea* did not hold that

damages would never be available in § 301 suits against individuals. *See Madden v. Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers*, 889 F. Supp. 2d 707, 712 (S.D.N.Y. 1995) (citing *Shea* but recognizing that "[t]he Second Circuit . . . has never reached the issue of whether individual union officers may be held liable for breach of a union constitution."). Instead, *Shea* observed that "recovery" in § 301 suits against "union officials who violate obligations . . . assumed" under union constitutions "would be equitable in nature." *Shea*, 953 F.2d at 32.

It is this dictum in *Shea* that some district courts have construed as a holding that in all § 301 causes of action against individual union members only equitable relief is available. Such a broad application of § 301(b), however, finds no support in *Atkinson* or *Compete Auto Transit* nor in the legislative history. Moreover, the majority of cases relying on *Shea* – and all the cases relied on by defendants here – involved § 301 suits where both the union and union members were named as defendants. *See, e.g.*, *Commer*, 2006 U.S. Dist. LEXIS 82395, at *46-47, 48-53 (dismissing damages claim against individual union officers but not against union) (collecting cases); *Farrell*, 367 F. Supp. 2d 491 (granting plaintiffs summary judgment against union but dismissing damages claim against individual defendant); *Cf. Rider v. Macaninch*, 424 F. Supp. 2d 353 (D.R.I. 2006) (dismissing claim against individual, where union was not a defendant). Here, plaintiffs are union entities and they seek relief against individual union officers who breached their contractual duties to the union.

The better view of § 301(b) is that it merely protects individual union members from damages liability for injuries caused by the wrongful acts of their union. It does not, however, immunize individual union officials from liability for their own breaches of a union constitution. This is especially true here, where the breaches do not concern the union/employer relationship –

as was Congress' chief concern, but rather go the heart of the union's representation of its members' interests.

*Guzman v. Bevona*, 810 F. Supp. 509, 512 (S.D.N.Y. 1992) ("*Guzman I*") is instructive. There, a union member brought action against union officials, but not the union itself, alleging, among other things, that the union officials had violated § 301 when they retaliated against him for his criticism of union leadership's "exorbitantly high salaries" and "the hike in [member] dues." *Id*. at 510-11. The district judge found that § 301(b) did "not bar a claim for damages under § 301(a)." *Id*. at 512. So too here. Plaintiffs allege that union officers "inflicted the injury" on the union entities when they breached their obligations to protect the Local's jurisdiction and undermined the union members' representational rights. LIUNA and the LIUNA Trustee, Masino, sought to protect the union entities from defendants' misconduct and plaintiffs here seek a money judgment against defendants and in favor of the union. Section 301(b) simply does not apply to plaintiffs' claims in counts 1 and 2 and, thus, does not bar an award of monetary relief against defendants.

Rather than rely on *Guzman I*, however, plaintiffs have abandoned their damages claims under § 301 and sought to refashion them as claims for declaratory and equitable relief. Pls.' Opp'n Mem. at 32. Plaintiffs argue that their prayer "for such other and further relief," compl. at 44, "is broad enough to encompass" a declaratory "judgment that Defendants breached their several constitutional obligations" and "equitable relief in the form of disgorgement by Defendants of their compensation during the period that they breached their obligations under the LIUNA Constitutions." Pls.' Opp'n Mem. at 32. Alternatively, plaintiffs seek leave to amend their complaint to "add a prayer for declaratory relief and for equitable relief in the form of disgorgement or forfeiture of Defendants' compensation." *Id*. at 32-33.

Defendants argue that plaintiffs may not obtain equitable relief because defendants are no longer affiliated with Locals 1018 and 1010 or the District Council. Defendants cite *Farrell*, 367 F. Supp. 2d at 505 and *Guzman v. Bevona*, 90 F.3d 641, 650 (2d Cir. 1996) ("*Guzman IV*") for support. *Farrell* relied on *Guzman IV* in finding that an individual defendant who was no longer affiliated with the local was "not appropriately . . . the target of an *injunction*." 367 F. Supp. 2d at 505 (emphasis added). In *Guzman IV*, the district court had enjoined the defendant union officers from engaging in activity that would inhibit plaintiff's exercise of his free speech right to criticize union leadership. 90 F.3d at 645. The Second Circuit modified the district court's order to except from the injunction defendants who had retired from the union because, there was not "'a reasonable likelihood that the wrong w[ould] be repeated [by these retired defendants].'" *Id*. at 650. Here, plaintiffs do not seek to enjoin defendants from further breaches of the LIUNA Constitutions. Instead, they seek a declaratory judgment that defendants breached the LIUNA Constitutions in the past and an order compelling them to disgorge the compensation they received during the period of these past breaches. With respect to these equitable remedies, as opposed to an injunction, it is irrelevant that defendants are no longer affiliated with the Locals and District Council.

Defendants also argue that permitting plaintiffs to maintain a claim for equitable relief would cause them prejudice because, had they known that disgorgement was the "relief sought, Defendants would have more vigorously pursued the deponents in determining the exact time frame they believe the breaches occurred." Defs.' Reply Mem. at 20. This argument lacks any merit. Because the facts, issues, and time frame presented by plaintiffs' § 301 claims are the same whether the relief sought is damages or equitable disgorgement, defendants simply have not shown that they would be prejudiced were plaintiffs permitted to seek equitable

disgorgement as opposed to damages in relation to counts 1 and 2. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

In exercising its equitable jurisdiction a district court has the power "'to mould each decree to the necessities of the particular case.'" *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). "'[D]isgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment.'" *S.E.C. v. Drexel Burnham Lambert, Inc.*, 956 F. Supp. 503, 505 (S.D.N.Y. 1997) (internal citation omitted) (quoting *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989) (disgorging salary paid defendants in securities fraud case)). Moreover, disgorgement of compensation is an appropriate equitable remedy where an officer breaches his fiduciary obligations to his employer. *See, e.g., Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (applying New York's "faithless servant doctrine"). Indeed, "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commission or salary." *Id.*; *Restatement (Second) of Agency* (1959) § 469. Application of this principle is particularly appropriate in the labor context where union members have entrusted their collective bargaining rights to the union leadership and where those leaders have taken on oath to, among other things, "conduct [the union entities'] affairs in a manner which would most tend to enhance, conserve and protect the welfare and interest of the International Union, its affiliates and members." Mehlasack Dec., Ex. 16C, Art. II §1(c).

In *Shea, supra*, the Second Circuit recognized that individual union officials may be subject to equitable relief for breaches of union constitutions under § 301. *See Shea*, 953 F.2d at 32 (collecting cases). Moreover, *Shea* cited with approval two cases where unions sought monetary equitable relief from individual defendants. *See, e.g., Mayes v. Local 106, Int'l Union*

*of Operating Engineers*, 739 F. Supp. 744, 745, 747 (N.D.N.Y. 1990) (union counterclaimed for expenses incurred by it defending charges brought by union member); *Nat'l Ass'n of Basketball Referees v. Middleton*, 688 F. Supp. 131, 132 (S.D.N.Y. 1988) (union sued members to collect special assessment levied on all members, but which defendants refused to pay).

*Guzman v. Bevona*, No. 92 Civ. 1500, 1995 WL 110584 (S.D.N.Y. Mar. 15, 1995) ("*Guzman II*") is also on point. There, a union member sought injunctive relief against defendant union officers including an order that defendants "pay back to [the] Local . . . all funds improperly paid from the Local's funds." *Id*. at *7. *Guzman II* held that § 301 did not bar a claim for such relief and looked to the union constitutions to determine whether they provided for the remedies sought. Finding that "both constitutions specifically [provided] that union leaders may be fined," the court denied defendants' motion for summary judgment as to plaintiffs § 301 claim "seeking a judgment ordering Defendants to pay back to [the] Local . . . all funds improperly paid to Defendants or for Defendants." *Id*. at *7-8. Following a jury trial, the district judge held that plaintiff was "entitled to: . . . an order and judgment directing Gus Bevona [the Local's President] and the individual defendants to repay the union $19,343.48." *Guzman v. Bevona*, No. 92 Civ. 1500, 1995 WL 876386, at *7 (S.D.N.Y. Oct. 13, 1995) ("*Guzman III*").

The *Guzman* cases are instructive here. Just as in *Guzman*, plaintiffs seek an order that the defendants pay back certain funds that were paid from the locals' funds, i.e. that defendants be disgorged of their compensation during the period of their breaches of the LIUNA Constitutions. And just as in *Guzman*, the union constitution authorizes fines for certain breaches of union officers' oath to comply with the LIUNA Constitutions. Indeed, Article XVIII § 2 of the International Union Constitution provides that any officer of a local or district council, who attempts to cause secession from LIUNA or affiliates with or joins an entity not created by

LIUNA, "may be fined, suspended, expelled or placed in trusteeship." Mehlsack Dec., Ex. 16A at 49. Thus, the fine provision of the International Union Constitution permits plaintiffs to obtain, at the very least, disgorgement of compensation paid to defendants during the period of defendants' breaches to the extent those breaches involved activities related to the alleged raiding of Locals 1010 and 1018's membership or affiliation with Locals 175 and 450A. Nevertheless, because the parties have not briefed the issue of the relief contemplated by the LIUNA Constitutions, I reserve judgment as to the scope of monetary relief to which plaintiffs are entitled and hold only that § 301 does not, as a matter of law, bar all forms of monetary relief.

I now turn to the merits of plaintiffs' claim' that defendants breached the LIUNA Constitutions.

### B. Evidence of Defendants Breaches of the LIUNA Constitutions

Plaintiffs argue that the defendants breached the LIUNA Constitutions, which consist of the International Union Constitution (Mehlsack Dec., Ex. 16A), the Uniform District Council Constitution (Mehlsack Dec., Ex. 16B), and the Uniform Local Union Constitution (Mehlsack Dec., Ex. 16C). The LIUNA Constitutions are contracts within the plain meaning of § 301(a). *Shea*, 953 F.2d at 31 (citing *United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. v. Local 334*, 452 U.S. 615, 627 (1981)). Moreover, the LIUNA Constitutions are contracts of which LIUNA "and all of its members are parties and which [are] binding on all of them." *Shea*, 953 F.2d at 32. Indeed, "union officials who violate obligations thus assumed are subject to suit under § 301(a) by other members whose interests are affected adversely." *Id*.

Each of the individual defendants were elected union officials who took an oath to comply with all of the provisions of the LIUNA Constitutions. Mehlsack Dec., Ex. 16B, Art.

XIII (oath to District Council); Mehlsack Dec., Ex. 16C, Art. XIII (oath to local union). Under the Local Union Constitution all of the defendants were bound "[t]o conduct [the Local's] affairs in a manner which would most tend to enhance, conserve and protect the welfare and interest of the International Union, its affiliates and members." Mehlsack Dec., Ex. 16C, Art. II § 1(c). Moreover, as members of Locals 1010 and 1018, each of the defendants was bound:

> To refrain from attempting to cause secession by the Local Union from the International Union; . . . assisting an organization threatening to, or undermining the representational rights of the International Union or any of its affiliates; and . . . advocating or seeking the division of the funds of the Local Union.

*Id*. at Art. III § 3(g).

The evidence in support of plaintiffs' claims of breach against Falzone and the Local 1018 defendants, as well as Montelle and the Local 1010 defendants, are addressed in turn.

### 1. Falzone

In addition to the overriding fiduciary obligations described above, Falzone, as Business Manager of Local 1018 and President of the District Council, was obligated to protect the local's jurisdiction, visit project sites, and generally keep informed of all work being done with the local's jurisdiction. Mehlsack Dec., Ex. 16C, Art. IV § 4(E); Mehlsack Dec., Ex. 16B, Art. II § 1(f). Plaintiffs have produced evidence from which a jury could conclude that not only did Falzone seek to entrench himself and others in their union leadership positions in opposition to LIUNA's reform efforts, but that he failed to protect Local 1018 and the District Council's jurisdiction and attempted to cause the secession of those entities from LIUNA.

Beginning in early 2004, Falzone, along with Montelle and others, made efforts to thwart the reform efforts of LIUNA and the LIUNA Trustee, Masino, by, among other things, amending agreements governing the District Council Benefit Fund to prevent Masino from removing Franco and the Fund trustees. *See Masino v. Montelle*, No. 05 CV 2447, Rep. & Rec. at 7-8

(E.D.N.Y. Jul. 14, 2005).  Falzone used Local 1018 funds to attempt to prevent an impending trusteeship, Mehlsack Dec., Ex. 26 at Morello B-69, and, when that effort failed, established the Death Benefit Fund to "prevent[] the trustee from having access to the funds of the Local Union."  Deposition of Luciano Falzone ("Falzone Dep.") 178 (attached as Ex. 7 to Mehlsack Dec.).

Falzone actively encouraged secession from LIUNA.  In early April 2005, he recommended that "[t]o avoid the Trusteeship and or charges, . . . the Executive Board & membership [of Local 1018] resign [its] LIUNA membership and join forces with another union."  Mehlsack Dec., Ex. 25 at Morello A-111.  There is also evidence that Falzone not only failed to protect Local 1018's jurisdiction from raiding by Local 175, Falzone Dep. 237-38, but that he solicited Local 1018 members to sign authorization cards with Local 175 – a local not affiliated with LIUNA.  John Peters, the deputy trustee under Masino, testified at his deposition that sometime in early May 2005, before Falzone resigned from Local 1018, he heard Falzone "telling the [Local 1018] members that if [they] didn't sign [Local 175] authorization cards . . . they wouldn't be able to work for any NYCIA employers."  Peters Dep. 87-88.

Nevertheless, Falzone testified at his deposition that he did not know that Local 1018 members were being solicited by Local 175 until late April 2005 and that he never solicited his members to sign Local 175 authorizations cards.  Falzone Dep. 235-36.  Putting aside questions regarding the credibility of Falzone's testimony, which a jury would be entitled to reject, there is uncontroverted evidence that Falzone failed to take steps, as he was obligated to as Business Manager, to protect Local 1018 members from Local 175's raiding efforts.  Indeed, Falzone testified that even after he knew Local 175 was signing up his Local 1018 members he did not "try to get" Local 1018 members to "sign cards on behalf of 1018" as opposed to 175.  Falzone

Dep. 237. Moreover, the chronology of events in early May 2005 presents strong circumstantial evidence that Falzone not only failed to protect Local 1018's jurisdiction, but that he was involved in the alleged raiding by Local 175: on May 2, 2005, he wrote to the NLRB and formally relinquished Local 1018's representational rights, Chaikin Dec., Ex. F; on May 4, he brought NYICA Local 175 authorization cards signed by former Local 1018 members, Falzone Dep. 253-53; on May 6, he and the entire Executive Board resigned from Local 1018, Karfunkel Dec., Ex. B; on or before May 9, he became Business Manager of Local 175, Karfunkel Dec., Ex. M; and on May 9 and 13, using the member address list he had compiled while Business Manager of Local 1018, Falzone Dep. 251-52, he wrote to former 1018 members encouraging them to sign up with Local 175. Karfunkel Dec., Exs. M, N.

## 2. Local 1018 Defendants

Defendants argue that plaintiffs have failed to present sufficient evidence as to any of the Local 1018 defendants' breaches of the LIUNA Constitutions. The Local 1018 defendants are: Robert Maresco, President and Executive Board member; John Morello, Recording Secretary and Executive Board member; Calogero Falzone, Secretary Treasurer and Executive Board member; and Executive Board members Roland Bedwell, Constantine Seminatore, and Alfonso Leto.[2] At the very least, plaintiffs have presented sufficient evidence as to the Local 1018 defendants' breach of their obligation to promote and protect Local 1018's jurisdiction. Indeed, all of the Local 1018 defendants, with the exception of Seminatore, were present at the April 2005 Executive Board meeting where Falzone recommended and all present voted in favor of resigning their LIUNA membership and "join[ing] forces with another union." Mehlsack Dec.,

---

[2] In their memorandum in opposition, plaintiffs do not mention nor list Alfonso Leto as one of the Local 1018 defendants. Nevertheless, they identify him in the Amended Complaint, *see* compl. ¶ 14, and he appears as a voting member of the Executive Board in its meeting minutes. Mehlsack Dec., Ex. 25 at Morello A-111.

Ex. 25 at Morello A-111. Moreover, there is evidence that all of the Local 1018 defendants took measures to thwart LIUNA's reform efforts. At a May 2004 Board meeting, all of these defendants voted in favor of allocating $100,000 of local funds to defend against the anticipated trusteeship. Mehlsack Dec., Ex. 26 at Morello B-69. Whether this effort to thwart the trusteeship was in the best interests of the local or whether it "undermin[ed] the representational rights of the International Union or any of its affiliates" is a question for the trier of fact.

### 3. Montelle

Plaintiffs have also presented sufficient evidence of Montelle's breaches. As discussed above, there is evidence that Montelle, along with Falzone, made efforts to thwart the reform efforts of LIUNA and Masino, the Trustee, by, among other things, amending agreements governing the Benefit Fund to entrench himself as a fund trustee. Moreover, as Business Manager of both Local 1010 and the District Council, Montelle was obligated to protect not only Local 1010's jurisdiction, but the jurisdiction of all local's within the jurisdiction of the District Council, including Local 1018. Mehlsack Dec., Ex. 26B Arts. II §1(f), VII § 4. Yet when Masino informed Montelle that Local 1018 members were signing Local 175 authorization cards and that he was suspicious Falzone was involved, Montelle "said he had no knowledge about what was going on between Luciano [Falzone] and Local 175 and 1018." Masino Dep. 115-16. When Masino told Montelle that he would help Montelle protect Local 1010 from similar raiding by having Local 1010 membership sign authorization cards, Montelle refused. He stated that his predominantly Portuguese-speaking members would see the authorization card drive as a sign of Local 1010's weakness. Masino Dep. 116. John Peters, who ultimately was able sign up roughly 800 of the 1000 Local 1010 members after Local 1010 had been placed under trusteeship, testified at his deposition that Montelle's refusal to sign up his members was suspect

"[b]ecause [under the circumstances] anybody in this industry, in the construction industry, would 9A his workers [have them sign authorization cards] to protect their jurisdiction." Peters Dep. 92.

These failures are not the only evidence of Montelle's breaches. Shortly after he disclaimed any knowledge of the raiding of Local 1018's membership and refused to sign up Local 1010 members, Montelle and the other Local 1010 defendants resigned from Local 1010 and the District Council, Karfunkel Dec., Exs. D, E, and Montelle surrendered the lease for Local 1010's – as well as Local 1018's and the District Council's – headquarters to Anthony Franco, the administrator of the Benefit Fund whom LIUNA had repeatedly ordered Montelle to remove. Ex. A to Affidavit of Bruce L. Listhaus ("Listhaus Dec."). The surrender of the lease for the headquarters itself was a breach because Montelle, upon his resignation, was obligated to turn over property in his custody to LIUNA, not some third party. Mehlsack Dec., Ex. 16C, Art. IV § 6. Moreover, Montelle's surrender of the lease left Locals 1010 and 1018 and the District Council without a headquarters from which to operate and deprived plaintiffs of union property, most notably membership lists and computers, necessary for its ongoing operation. Peters Dep. 114-117; Masino Dep. 64-5. Montelle never returned the complete member lists to the union. Peters Dep. 94.

Montelle's subsequent creation and self-appointment as Business Manager of Local 450A, a local not affiliated with LIUNA, is also strong circumstantial evidence of his willing failure to promote and protect the jurisdiction of Locals 1010 and 1018. Indeed, there is evidence that Montelle had begun planning the creation of Local 450A well in advance of his resignation from Local 1010. He did so as a means of ensuring he would have a union position

should LIUNA place Local 1010 under trusteeship and that he would maintain control over the Benefit Funds. Montelle Dep. 12, 60.

### 4. Local 1010 Defendants

The Local 1010 defendants are: Rocco Ciancio, President and Executive Board member of Local 1010 and Executive Board member of the District Council; Anibal Ribeiro, Vice President and Executive Board member of Local 1010 and Executive Board member the District Council; and Joseph Montelle, Secretary Treasury and Executive Board member of the Local 1010. As elected officials, each of these defendants took an oath to comply with the LIUNA Constitutions, which included, among other things, a duty to promote and protect the jurisdiction of Local 1010; Ciancio and Ribeiro, as members of the District Council Executive Board, were also obligated to protect the jurisdiction of Local 1018 as well. The evidence plaintiffs have presented as to the other defendants' breaches is strong circumstantial evidence that the Local 1010 defendants breached the LIUNA Constitutions by failing to take action to prevent the raiding of Local 1018, the failure to mount an authorization drive for Local 1010 members in light of the raid, and the abandonment of the union entities' headquarters.

Moreover, as plaintiffs note, Ciancio is a defendant in a related case, *Masino v. Montelle*, 05 CV 2447, concerning control over the District Council Benefit Funds. On August 18, 2005, I adopted the Report and Recommendation of U.S. Magistrate Judge Levy granting plaintiffs' motion for preliminary injunction. U.S. Magistrate Judge Levy had found that Ciancio, along with his co-defendants, had altered the agreement governing those funds so as to entrench themselves and prevent LIUNA and LIUNA's Trustee from removing them. *See Masino*, No. 05 CV- 2447, Rep. & Rec. (E.D.N.Y. Jul. 14, 2005). A finding that plaintiffs in that matter – the same plaintiffs here – had shown a likelihood of success on the merits in their claim that Ciancio

sought to thwart LIUNA's reform efforts by entrenching himself as a trustee of the Benefit Funds, is sufficient to create a genuine issue of fact as to whether Ciancio breached his duties under the LIUNA Constitutions.

*     *     *

In sum, § 301(b) does not bar plaintiffs' claims for monetary relief whether such relief is sought in law or equity. Moreover, plaintiffs have presented evidence sufficient from which a trier of fact could find that each of the defendants breached their duties under the LIUNA Constitutions.

## II. State Law Claims

Defendants make two arguments with respect to plaintiffs' state law claims. First, they argue counts 3 through 6, which allege that defendants have breached their fiduciary duties to plaintiffs in violation of N.Y. Labor Law § 722, are preempted by § 301. Second, they argue that plaintiffs have not presented sufficient evidence in support of any of their state law claims, counts 3 through 8.

"'[W]here the resolution of a state-law claim depends on the interpretation of [a contract covered by § 301], the claim is pre-empted.'" *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260-62 (1994) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988)). However, the mere fact that a contract covered by § 301 "will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) (citing *Lingle*, 486 U.S. at 413 n.12). Preemption under § 301 "says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon interpretation of such agreements." *Lingle*, 486 U.S. at 409. Indeed, § 301 does not "preempt state rules that proscribe conduct, or establish rights and

obligations, independent of a labor contract." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 212 (1985); *Livadas*, 512 U.S. at 123.

The relationship between union members and officials "is one governed not so much by simple contract law but by principles which determine . . . fiduciary obligations." *Bradley v. O'Hare*, 202 N.Y.S.2d 141, 154 (1st Dep. 1960); *see* N.Y. Labor Law § 720 ("union officers and agents have a fiduciary duty to serve the members of the union honestly and faithfully"). Recognizing that "unscrupulous labor leaders [might] . . . subvert the interests of their members for personal gain," *CC Lumber Co., Inc. v. Waterfront Comm'n of N.Y. Harbor*, 292 N.E.2d 1, 5 (N.Y. 1972) (internal citation omitted), the New York legislature enacted the Labor and Management Improper Practices Act, N.Y. Labor Law §§ 720 *et seq.*, to "aid[] and supplement[]" "labor's efforts to correct abuses from within." N.Y. Labor Law § 720.

Section 722 of the Labor and Management Improper Practices Act provides:

No officer or agent of a labor organization shall, directly or indirectly

1. Have or acquire any pecuniary or personal interest which would conflict with his fiduciary obligation to such organization;

2. Engage in any business or financial transaction which conflicts with his fiduciary obligation; or

3. Act in any way which subordinates the interests of such labor organization to his own pecuniary or personal interests.

N.Y. Labor Law § 722.

Counts 3 through 6 allege that defendants – all of whom were elected officials and, thus, agents of one or more of the union entities – breached their fiduciary duties to the unions by engaging in conduct proscribed by N.Y. Labor Law. § 722. While the LIUNA Constitutions contain provisions which obligate defendants to "protect the welfare and interests of the International Union, its affiliates and members," Mehlsack Dec., Ex. 16C, Art. II § 1(c), a

determination whether the defendants breached their fiduciary duties under § 722 does not require interpretation of the LIUNA Constitutions. Instead, it requires a determination as to whether defendants engaged in any activities proscribed by or breached any obligations established by New York law. These state law rights, which "are independent of [those] labor contract[s]," *Allis-Chalmers*, 471 U.S. at 212, "can [not] be waived or altered by agreement of private parties [and, thus,] are [not] pre-empted by those agreements." *Id*. at 213; *see Pennsylvania Nurses Ass'n v. Pennsylvania State Educ. Ass'n*, 90 F.3d 797 (3d Cir. 1996) (§ 301 did not preempt plaintiffs state law breach of fiduciary claim).

While I conclude that the state law causes of action are not preempted, at this time it is not necessary to address defendants' other challenges to those claims. Plaintiffs' state law claims arise out of the same nucleus of fact as the federal claims in counts 1 and 2, which have to be tried. "If one [or more] of a number of integrally related causes of action have to be tried, it makes no sense to grant summary judgment as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that summary judgment was improperly granted." *Manzi v. DiCarlo*, 62 F. Supp. 2d 780, 793 (E.D.N.Y. 1999). Indeed, as the Second Circuit has observed:

> [T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue.

*Audi Vision Inc. v. RCA Mfg. Co*., 136 F.2d 621, 625 (2d Cir. 1943).

## **Conclusion**

The defendants' motion for summary judgment is denied without prejudice.


Brooklyn, New York
May 12, 2009

SO ORDERED.

*Edward R. Korman*
Edward R. Korman
United States District Judge